**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS; CULINARY WORKERS UNION LOCAL 226, *Plaintiffs-Counter-Defendants-Appellants*, <br><br> v. <br><br> MIRAGE CASINO-HOTEL, INC., *Defendant-Counter-Claimant-Plaintiff-Appellee.* | No. 16-16754 <br><br> D.C. No. 2:15-cv-01225-GMN-PAL <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, Chief District Judge, Presiding

Argued and Submitted December 5, 2017
San Francisco, California

Filed December 13, 2018

Before: John B. Owens and Michelle T. Friedland, Circuit
Judges, and Elaine E. Bucklo,[*] District Judge.

---

[*] The Honorable Elaine E. Bucklo, United States District Judge for
the Northern District of Illinois, sitting by designation.

Opinion by Judge Bucklo;
Concurrence by Judge Owens;
Dissent by Judge Friedland

## SUMMARY[**]

### Labor Law / Arbitration

The panel reversed the district court's summary judgment confirming, pursuant to the Labor Management Relations Act, an arbitration award entered in favor of Mirage Casino-Hotel, Inc., on a union's grievance under the parties' collective bargaining agreement.

Mirage subcontracted with another company to operate a venue, and the memorandum of agreement provided that the other company would "directly employ" the union's food and beverage workers and would be responsible for paying their wages and employee benefits. Mirage, however, would control the terms and conditions of employment. The other company soon declared bankruptcy and failed to pay certain benefits before closing. Mirage declined to step in, and the union filed a grievance. The arbitrator ruled that the union's grievance, filed pursuant to the CBA, was not arbitrable.

The panel explained that the parties' substantive dispute concerned whether Mirage was obliged under Article 29 of the CBA and the MOA to ensure that the workers received payment for accrued benefits. The dispute was arbitrable if

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

it fell within the arbitration agreement expressed in Article 21 of the CBA.  Its arbitrability was to be determined by the arbitrator if the parties "clearly and unmistakably" agreed to submit that question to him.  The union's position would be meritorious if its theory was supported by the CBA and the other evidence.

The panel concluded that the arbitrator conflated these inquiries in concluding that the dispute was not arbitrable because Mirage was not the workers' employer.  The panel held that, under the terms of the CBA, which required Mirage to arbitrate grievances, the dispute was substantively arbitrable.  Further, the union's assent to the arbitrator deciding arbitrability could not be inferred from its post-hearing briefing or its failure to call a halt to the arbitration proceedings and seek judicial review of arbitrability.  The panel reversed the district court's judgment and remanded with instructions to vacate the arbitration award.

Concurring, Judge Owens wrote that, although the dissent reached a more equitable result, the majority's opinion was more consistent with controlling law.

Dissenting, Judge Friedland wrote that the "clear and unmistakable" test for determining whether a party resisting arbitration has nevertheless consented to having the arbitrator decide substantive arbitrability does not also apply when determining whether a party that initiates arbitration has so consented.  Because the union submitted the dispute to arbitration in the first place, Judge Friedland would instead apply traditional standards of waiver to the union's actions.  She would hold that, under those standards, the union waived its objection to the arbitrator's deciding the substantive arbitrability question.

**COUNSEL**

Paul L. More (argued), Yuval Miller, Sarah Grossman-Swensen, and Richard G. McCracken, McCracken Stemerman & Holsberry LLP, Las Vegas, Nevada, for Plaintiffs-Counter-Defendants-Appellants.

Kaitlyn M. Burke (argued) and Roger L. Grandgenett II, Littler Mendelson P.C., Las Vegas, Nevada, for Defendant-Counter-Claimant-Plaintiff-Appellee.

**OPINION**

BUCKLO, District Judge:

The parties to this surprisingly nuanced appeal of a labor arbitration award are the Local Joint Executive Board of Las Vegas and Culinary Workers Union, Local 226 (together, the "Union"), and the Mirage Casino-Hotel, Inc. ("Mirage," or the "Company"). Mirage operates a hotel and casino on the Las Vegas Strip. The Union represents Mirage's food and beverage employees. A collective bargaining agreement ("CBA") governed the parties' relationship from 2007 to 2013.

In December of 2012, the Union filed a grievance against Mirage pursuant to Article 21 of the CBA, captioned "Grievance and Arbitration." The grievance culminated in an arbitration award in Mirage's favor after the arbitrator concluded that the grievance was "not arbitrable." The Union petitioned the district court to vacate the arbitrator's award pursuant to § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and Mirage filed a cross-petition seeking confirmation of the award. On cross-

motions for summary judgment, the district court confirmed the award, and the Union timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and reverse.

## I.

The events leading up to the Union's grievance are straightforward. In late 2009, Mirage subcontracted with Beale Street Blues Company Las Vegas, LLC ("BB King's") to operate a food and beverage venue called BB King's Blues Club and Grill at the Mirage. Their Memorandum of Agreement ("MOA") provided that BB King's would "directly employ" the Union's food and beverage employees and would be responsible for paying their wages and employee benefits. Mirage, however, would "at all times hold and exercise full control over the terms and conditions of employment of all of the employees."

BB King's opened at the Mirage in November of 2009, but its run was short-lived: BB King's declared bankruptcy in 2011 and shuttered permanently in November of 2012. At the time of BB King's closing, many of its employees had accrued vacation time for which the Union believed they had a right to payment under the terms of the CBA. When BB King's failed to pay these benefits, the Union turned to Mirage to enforce the employees' rights under the CBA. After it became clear that Mirage would not step in to ensure that the employees received the benefit of their collective bargain, the Union filed a grievance against Mirage on December 5, 2012. Mirage denied the grievance, which wended its way to arbitration. After an evidentiary hearing and partial briefing on the issues presented, the arbitrator concluded: "The dispute over vacation pay not paid to B. B. King employees upon the Club's closing is not arbitrable." The federal action now before us ensued.

As we explain below, the arbitrator's essential error was his failure to discern a critical distinction between the *arbitrability* of a grievance and its *merits*. The arbitrator compounded this error by neglecting a second important distinction between *procedural* arbitrability and *substantive* arbitrability. The arbitrator's confusion led him to decide an arbitrability question that he was not empowered to adjudicate on the mistaken belief that it was procedural, and to base his conclusion of non-arbitrability on an analysis anchored entirely in his view of the merits. Rather than correct the legal errors in the arbitrator's analysis, the district court echoed them, concluding that the Union's merits argument "encompasse[d]" the issue of substantive arbitrability and that by submitting the grievance for arbitration, the Union had implicitly authorized the arbitrator to render a decision on the scope of his own jurisdiction.

Unlocking the analytical puzzle before us requires a review of arbitration's first principles with a sharp focus on the limited but essential role of the courts in effectuating its basic canons. The application of those canons in this case leads us to the inescapable conclusion that the arbitrator's award cannot stand and that the district court's judgment must be reversed and the case remanded with instructions to vacate the arbitrator's award.

## A. The Arbitration Agreement

Article 21 of the CBA, entitled "Grievances and Arbitration," establishes the scope of the parties' arbitration agreement and related procedures. Section 21.01 defines a "grievance" as "a dispute or difference of opinion between the Union and Mirage involving the meaning, interpretation, [and] application [of the CBA] to employees covered by this Agreement," except that violations of the CBA's no-strike and no-lock-out provisions "shall not be subject to the

grievance and arbitration procedure."[1] Section 21.03 defines the exclusive procedures for adjusting "all grievances" and sets forth applicable time limits. Specifically, 21.03(a) provides that an aggrieved party must submit a written grievance identifying the claimed violation of the CBA within twenty calendar days of either the event giving rise to the grievance or the aggrieved party's knowledge of that event's occurrence. If the parties are unable to settle a grievance, Section 21.03(b) commands that the matter be set for hearing before a joint labor-management Board of Adjustment. And Section 21.03(c) provides for final and binding arbitration of grievances not settled by the board of adjustment. Finally, Section 21.04 provides that the time limits in Article 21 may be extended or waived by agreement.

## B. The Subcontracting Arrangement

The parties negotiated contractual obligations in the event Mirage subcontracted or subleased third-party operations on its property. The CBA, a side letter accompanying the CBA, and the MOA all contain provisions concerning the subleasing or subcontracting of Mirage facilities. Article 29 of the CBA provides that any work performed under subcontracting or subleasing arrangements must be performed by Union members and that Mirage shall maintain "full control of the terms and conditions of employment" of employees performing subcontracted work. Specifically, article 29.01 provides:

---

[1] Section 21.01 reads: "Any violation or alleged violation of Section 22.01 or 22.03 shall not be subject to the Grievance and Arbitration Procedure." There is no Section 22.03 in the CBA, but Section 22.02 contains the relevant text. We assume that the reference to 22.03 is a typographical error.

It is recognized that the Employer [i.e., Mirage] and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement and employed on a regular basis. Therefore, no work customarily performed by employees covered by this Agreement shall be performed under any sub-lease, sub-contract, or other agreement unless the terms of any lease, contract or other agreement specifically states that (a) all such work shall be performed only by members of the bargaining unit covered by this Agreement, and (b) the Employer shall at all times hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement. The provisions of this Article apply to all operations on the Employer's premises covered by this agreement, regardless of location or displacement of employees or prior use of the area occupied by such operations.

Side Letter #5, executed by the parties in July of 2009, modifies Mirage's obligations to allow additional "hiring flexibility" when opening new venues. It sets forth staffing and seniority procedures that apply to "the opening of . . . new branded, fine dining or ultra/gaming lounge venue[s] . . . located on [Mirage]'s premises"; requires Mirage to give notice to the Union before opening such venues; and establishes procedures for hiring Union employees.

In addition to the CBA and its side letters, the parties regularly negotiated venue-specific memoranda of

agreement, including as relevant here, the MOA executed by the Union, Mirage, and BB King's in November of 2009. The MOA stipulated that BB King's would operate as "an independent business enterprise" that would "directly employ" the venue's food and beverage employees and would be responsible for paying all wages and employee benefits to them. Echoing Article 29 of the CBA, the MOA went on to clarify that "[n]otwithstanding the foregoing, The Mirage will at all times hold and exercise full control over the terms and conditions of employment of all of the employees, as required by Section 29.01(b) of the Agreement." The MOA likewise reiterated that BB King's would operate the restaurant "strictly in accordance" with the CBA.

## C. The Union's Grievance

The Union invoked the CBA's grievance procedures on December 5, 2012, when it filed a formal grievance against Mirage based on BB King's failure to pay outstanding employee benefits in the wake of its bankruptcy and subsequent closure. The Union's central theory was that by failing to ensure that BB King's employees were paid for unused vacation time, Mirage violated the provisions in Section 29.01 of the CBA, Side Letter #5, and the MOA requiring Mirage to maintain "full control" over the terms and conditions of employment of BB King's employees. Mirage participated in the grievance proceedings described in Article 21 but disputed its liability for the payments. When the Board of Adjustment was unable to resolve the matter, the Union informed Mirage of its intent to submit the grievance to arbitration.

The parties held an arbitration hearing before Arbitrator Jonathan S. Monat on April 8, 2015. The hearing opened with the following colloquy:

ARBITRATOR MONAT: Is this matter properly before the arbitrator for a final and binding decision under the terms of the Collective Bargaining Agreement?

MR. GRANDGENETT [Mirage's attorney]: We are going to make the argument that it is not subject to arbitration.

ARBITRATOR MONAT: So that answer would be maybe?

MR. GRANDGENETT: Right. But we would agree for you to hear the merits of the underlying grievance.

ARBITRATOR MONAT: All right.

MR. JELLISON [Union's attorney]: And we will vigorously oppose—

MR. GRANDGENETT: I'm sure you will.

MR. JELLISON: —any last-minute argument for the first time raised at the hearing that it's not arbitrable.

ARBITRATOR MONAT: Okay. I'll just write this down. Company raises nonarbitrability.

The parties then stated the issues on which they sought resolution. In the Union's view, the dispute encompassed a single issue: "Has the Mirage violated the [CBA] and [MOA] by failing to pay BB King's employees their accrued

vacation pay and pay for unused floating holidays when the BB King's employees were terminated on or about November 11, 2012?" Mirage, however, presented four issues: (1) whether the grievance was timely; (2) whether the grievance was "subject to arbitration" against Mirage; (3) if subject to arbitration, whether Mirage violated the CBA by failing to pay the aggrieved employees' accrued vacation and holiday benefits; and (4) if Mirage was liable, what was the appropriate remedy?

Mirage explained the basis for its assertion that the grievance was not subject to arbitration as follows:

> The CBA obviously is between the Mirage and the culinary union, and this grievance deals with the nonpayment by BB King's, the lessee of the Mirage, of vacation pay accrued, unused vacation pay, and unused floating holidays. And the Mirage is not the employer of these particular employees, and so this is not even subject to arbitration.

The Union disputed that the grievance was untimely and further argued that Mirage had waived its timeliness objection in all events by raising it for the first time at the hearing. Responding to Mirage's second issue—whether the dispute was "subject to arbitration"—the Union's attorney stated:

> It's a little hard for me to understand exactly what their argument is, but it sounds like their argument on arbitrability is more on the merits than it is on procedural arbitrability. To the extent they say that they're not violating the contract, you know, that's an issue on the merits.

As the party submitting the grievance for arbitration, the Union obviously believed that the matter was substantively arbitrable, i.e., that it fell within the substantive scope of the parties' arbitration agreement as memorialized in Article 21 of the CBA. But the Union did not offer argument or evidence supporting that view, nor did it insist that any dispute over the issue be resolved by a court.

After these opening remarks, the parties presented opening statements followed by evidence on the merits of the Union's grievance. Both the Union and Mirage called witnesses and offered exhibits directed to whether the MOA and Article 29 of the CBA required Mirage to cover the unpaid vacation its subcontractor/lessee failed to pay. In lieu of closing arguments, the parties agreed to submit post-hearing briefs to the Arbitrator. In a letter memorializing their agreement, the Union's attorney informed the arbitrator that:

> The parties have agreed to submit briefs to you on the timeliness-arbitrability question 10 days after receipt of the transcript. The parties request you to then issue an expedited decision on the timeliness-arbitrability issue. If you rule that it is arbitrable, then the parties will submit a brief on the merits 10 days after receipt of your award on the timeliness-arbitrability issue.

The arbitrator agreed to "follow the instructions from the parties."

Despite the appearance of agreement, the first round of briefing revealed the parties' very different understandings of the issue—or issues—to be decided at the first stage of the bifurcated proceedings. Mirage's brief argued two points:

that the grievance was "not subject to arbitration" because BB King's—not Mirage—was the employees' employer, and that the grievance was not timely.**[2]** The Union, however, confined the substantive arguments in its brief to the issue of timeliness. It acknowledged Mirage's argument that it was not the aggrieved employees' employer but declined to counter it substantively at that time since in its view, the "issue clearly [went] to the merits of the case and w[ould] be dealt with when the parties submit[ted] their briefs to the Arbitrator on the merits of the case."

## D. The Arbitration Award

On June 2, 2015, the arbitrator issued a decision and award, which he viewed as resolving "two procedural issues": whether the grievance was "timely filed and therefore arbitrable," and whether the grievance "is not arbitrable because [Mirage] is not the employer under the CBA." The arbitrator noted that "the parties engaged in mutual discussion and decided to bifurcate procedural arbitrability from the merits," and requested that he "decide the procedure issue first." In this way, the arbitrator continued, the parties "authorized [him] to provide an answer to the procedural question"—before turning to the merits.

The arbitrator began his analysis by observing that, "as a general rule, there is a presumption of arbitrability when a CBA contains a grievance procedure within which the last step is final and binding arbitration," and that "legal precedent provides that the Arbitrator is the one to determine

---

**[2]** Mirage also disputed the Union's assertion that Mirage had waived any objection to arbitrability by failing to assert it any time prior to the hearing.

procedural questions of timeliness and arbitrability." The arbitrator went on to chronicle the events leading up to the grievance and the steps the parties took to resolve it. He noted that the grievance was timely filed and found that although it lay dormant for almost two years thereafter, Mirage was at least partially responsible for the delay. Moreover, Mirage's conduct indicated a willingness to proceed to arbitration, which "created an expectation of resolution of the issue on the merits." For these reasons, the arbitrator concluded that Mirage had waived its timeliness objection.

The arbitrator then proceeded to consider whether the grievance was "not subject to being arbitrated because Mirage was not the employer but a lessor." In this connection, he quoted provisions in the MOA defining the relationship between Mirage and BB King's and establishing BB King's responsibility for the operation of its restaurant and employment of its employees. The arbitrator observed that although BB King's "is not a signatory to the CBA between Mirage and the Union," the MOA stipulates that it "will operate the Restaurant strictly in accordance with the [CBA]." The arbitrator then considered the text of Side Letter #5, Article 29.1 of the CBA, and the testimony of a Union witness involved in negotiating agreements among the Union, hotels, and subcontractors. Based on this evidence, the arbitrator determined that Mirage was not "the guarantor for payment of wages or benefits of [BB King's] employees," and that the parties' agreement that Mirage would "at all times hold and exercise full control over the terms and conditions of employment of all the employees" meant only that Mirage was required to "assure compliance with the CBA by [BB King's] and nothing else." For these reasons, the arbitrator concluded, "[t]he dispute over

vacation pay not paid to B.B. King employees upon the Club's closing is not arbitrable."

### E. The District Court's Decision

The district court considered whether to vacate the arbitrator's award on the grounds that it "d[id] not draw its essence from the CBA and usurp[ed] the role of the Court in determining whether the dispute is one the parties to the CBA agreed to submit to arbitration." Applying the "nearly unparalleled degree of deference" that generally attends a federal court's review of a labor arbitration award, the court confirmed the award. The court held that the Union's submission to the arbitrator of the merits of its grievance "necessarily encompasse[d]" the question of arbitrability, thus empowering the arbitrator to determine the latter. The court reasoned that by "clearly and unmistakably agree[ing] to arbitrate substantive issues," the Union consented to have the arbitrator decide substantive arbitrability.

The court went on to hold that the arbitrator did not exceed the scope of issues presented by considering merits-based arguments in proceedings limited to the "timeliness-arbitrability question." The court expressed sympathy for the Union's "apparent misunderstanding regarding the scope of the 'timeliness-arbitrability question,'" resulting in its failure to confront the substance of Mirage's argument that it was not the aggrieved employees' employer. But by agreeing to arbitration, the court held, the Union was bound to accept "the loose procedural requirements along with the benefits which arbitration provides." Further, the court reasoned, the Union was aware that Mirage viewed its asserted lack of an employment relationship with BB King's employees as a threshold arbitrability issue within the scope of the "timeliness-arbitrability" question and had the

opportunity to present any counter-arguments it may have had during the first stage of briefing.

On appeal, the Union argues that the arbitrator fundamentally misunderstood the concept of arbitrability. This is evident, the Union insists, by the arbitrator's failure to examine or even mention the only provisions of the CBA that are legally relevant to the issue of arbitrability, and by his grounding of his decision instead on his view of the grievance's substantive merits. The district court reproduced the arbitrator's confusion, the Union argues, when it held that the Union's merits argument "necessarily encompasse[d]" the legally and analytically distinct antecedent question of substantive arbitrability and that the Union's clear and unmistakable agreement "to arbitrate substantive issues" implicitly authorized the arbitrator to adjudicate the scope of his own jurisdiction.

## II. Analysis

We review de novo conclusions of law underlying the district court's decision confirming the arbitration award, but we accept any factual findings unless they are clearly erroneous. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947–48 (1995).

The cardinal precept of arbitration is that it is "simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943 (citing cases). This principle leads "inexorably" to a second: that substantive arbitrability, i.e., "whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance," is a question for judicial determination unless the parties "clearly and unmistakably provide otherwise." *AT & T Techs., Inc. v.*

*Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986), 475 U.S. 643, 649 (1986). Questions of procedural arbitrability, by contrast, are presumptively for the arbitrator. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85 (2002) (timeliness, waiver, and other "gateway" procedural matters growing out of the dispute are for arbitrator).

In disputes involving a collective bargaining agreement with arbitration provisions, the arbitrability inquiry begins with a presumption of arbitrability. *AT & T Techs.*, 475 U.S. at 650. This means that disputes involving the agreement's substantive provisions must be arbitrated "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960)). Importantly, however, where the matter in dispute is not whether a particular grievance falls within the scope of an arbitration agreement, but rather who—court or arbitrator— is empowered to decide arbitrability, the presumption is "reverse[d]" in favor of judicial, rather than arbitral, resolution. *First Options*, 514 U.S. at 945.

In this case, the parties' substantive dispute concerns Mirage's putative obligation under Article 29 of the CBA, Side Letter #5, and the MOA to ensure that BB King's employees received payment for unused vacation time and other accrued benefits due to them under the CBA. That dispute is *arbitrable* if it falls within the arbitration agreement expressed in Article 21 of the CBA; its arbitrability is determined *by the arbitrator* if the parties "clearly and unmistakably agreed" to submit that question to him; and it is *meritorious* if the Union's "control" theory is supported by the text of Article 29 of the CBA, Side Letter #5, the MOA, and other evidence presented at the hearing.

But the arbitrator conflated these distinct inquiries, holding that the grievance was "not arbitrable" without considering his authority to decide that issue, and, compounding the error, resting his holding on Article 29's "control" provisions and other provisions relevant to Mirage's putative responsibility for the claimed employee benefits but irrelevant to the parties' arbitration agreement.

Conspicuously, no one defends the arbitrator's analysis. Mirage does not contend that the contractual provisions on which the arbitrator relied (or any other portion of the CBA) authorized him to decide the issue of arbitrability, nor does it argue that the Union's grievance is non-arbitrable as outside the scope of the parties' arbitration agreement. In fact, part of what makes this appeal so inscrutable is that Mirage *agrees* that "the proper forum for the grievance was in arbitration as opposed to litigation in court." Because that is the essence of the substantive arbitrability inquiry— which, properly understood, examines the parties' arbitration agreement and determines whether a particular dispute is within its scope, and thus "arbitrable," or outside its scope, and thus "non-arbitrable"—Mirage has effectively conceded that the dispute is substantively arbitrable.

The arbitrator's conclusion that the grievance was not arbitrable simply misunderstood the arbitrability inquiry. As Mirage acknowledges, by "not arbitrable," the arbitrator meant that the grievance "was filed against the wrong party—Mirage rather than BB King's." But the Union's grievance asserts obligations that the Union believes the CBA and other agreements impose *on Mirage*. No one disputes that the CBA requires Mirage to arbitrate "grievances," and Mirage has never contended that disputes involving its subcontractors fall outside the CBA's definition of a "grievance." The arbitrator apparently

concluded that the Union's exclusive remedy to recover the claimed benefits was against BB King's; but whatever the soundness of that conclusion, it plainly had nothing to do with substantive arbitrability, which, again, concerns only whether the dispute falls within the scope of the parties' arbitration agreement. *See First Options*, 514 U.S. at 942.

The district court did not disembroil the arbitrator's analysis. Without endorsing the arbitrator's reasoning, the district court upheld the award on the ground that it was entitled to "nearly unparalleled" deference and that it was sufficiently grounded in the "essence" of the CBA to satisfy minimal scrutiny. But the court's extreme deference was premised on two, equally erroneous beliefs: first, that the substance of the Union's grievance "encompasse[d]" the question of arbitrability, and second, that by agreeing to arbitrate "substantive issues," the Union implicitly authorized the arbitrator to determine whether the grievance itself was arbitrable. Neither view can be squared with *First Options*, which explained that a disagreement over *who should decide the merits* of a dispute is distinct from a disagreement over *who should decide who decides* the merits. 514 U.S. at 942.

The district court relied on *Schoenduve Corp. v. Lucent Techs*., 442 F.3d 727 (9th Cir. 2006), to hold that the Union's submission of the merits "encompasse[d]" the issue of arbitrability. But in *Schoenduve*, the employer seeking to vacate the arbitration award had conceded the arbitrator's jurisdiction to resolve the dispute submitted to him, which was defined broadly as "an action to recover those commissions, interest and other damages arising from the wrongful conduct of [the employer]" and asserted "breach of contract and other claims." *Id*. at 732. The employer objected to the arbitrator's award because it relied on the doctrines of

quasi-contract and estoppel, which the arbitration demand did not specifically assert. *Id*. at 729. This court upheld the award, observing that the parties' arbitration agreement was "intend[ed] to reach all aspects of their relationship," and that courts generally defer to arbitrators' interpretation of the scope of issues submitted. *Id*. at 733–34. But however broadly arbitrators may interpret the substantive scope of merits issues presumptively before them, neither *Schoenduve* nor the remaining authorities cited by the district court suggest that an agreement to arbitrate the merits "encompasses" the question of arbitrability, which carries a "reverse" presumption favoring judicial determination, *see First Options*, 514 U.S. at 944–45.

The district court further concluded that "the Union's post-hearing brief demonstrates that it submitted the substantive arbitrability question to the Arbitrator." The court pointed to the Union's statement that the issue of whether Mirage was the employer of BB King's employees "*will be dealt with* when the parties submit their briefs to the Arbitrator on the merits of the case." (District court's emphasis.) But this statement only underscores that the Union viewed Mirage's claimed absence of an employment relationship with the aggrieved employees as a *merits* issue, not an arbitrability issue—a view the Union had previously expressed at the arbitration hearing. Even if the Union were wrong on that score, it cannot be deemed to have implicitly empowered the arbitrator to decide arbitrability based on its submission of an issue it explicitly claimed had nothing to do with arbitrability. *See First Options*, 514 U.S. at 943; *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Distribs., Teamsters Local 63*, 849 F.2d 1236, 1239 (9th Cir. 1988) (alteration in original) ("Courts refer the question of arbitrability to the arbitrator 'only if [the parties] leave no doubt that such was their intent.'" (quoting *Bhd. of*

*Teamsters Local 70 v. Interstate Distrib. Co.*, 832 F.2d 507, 510 (9th Cir. 1987))); *see also ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 631–32 (5th Cir. 2014) (party's consent to an arbitrator's jurisdiction over a limited merits issue did not evidence a "clear and unmistakable intent to be bound by the arbitrator's decision on arbitrability" of a related issue).

Nor can the Union's assent be inferred from its failure to call a halt to the arbitration proceedings and seek judicial resolution of arbitrability. In Mirage's view, it was incumbent upon the Union to stop the arbitration and seek a judicial order compelling arbitration when it became clear that there was a dispute over substantive arbitrability, and that, having failed either to do so or to preserve its objection, the Union cannot now be heard to complain that the arbitrator exceeded his jurisdiction. We disagree for several reasons.

First, it was far from clear during the arbitration proceedings that there really *was* a dispute over substantive arbitrability. Mirage raised no objection to arbitrability at any time during the preliminary grievance procedures established in Article 21. At the arbitration hearing, Mirage asserted for the first time that the grievance was "not subject to arbitration," but it went on to explain that its view rested exclusively on contractual provisions relating to the merits of the Union's grievance. At no point in the proceedings did Mirage mention the parties' arbitration agreement or cite Article 21 of the CBA. The cornerstone of Mirage's "arbitrability" challenge was that Mirage had no employment relationship with the aggrieved employees—the very crux of its merits challenge.

Second, *George Day Construction Co. v. United Brotherhood of Carpenters & Joiners of America*, 722 F.2d

1471 (9th Cir. 1984), does not persuade us that by failing to reserve the right to have a court decide arbitrability, the Union implicitly consented to the arbitrator's authority to decide that issue. In *George Day*, this court held that an employer who arbitrated the issue of substantive arbitrability alongside the merits and submitted both issues to the arbitrator without reservation had impliedly consented to the arbitrator's jurisdiction. 722 F.2d at 1475. But *George Day* predated the Supreme Court's decision in *AT&T Technologies* and did not apply the clear and unmistakable requirement the Court articulated in that case. Moreover, *First Options* later held that silence and ambiguity cannot commit the question of arbitrability to an arbitrator. 514 U.S. at 944–45. It is true that in *Pacesetter Construction Co. v. Carpenters 46 Northern California Counties Conference Board*, 116 F.3d 436, 439 (9th Cir. 1997), this court declined to adopt "wholesale" the Court's reasoning in *First Options*—a commercial arbitration case—and held that *George Day* remained good law in the labor context. But since *Pacesetter*, the Supreme Court has made clear that the "same framework" applies in both labor and commercial arbitration disputes. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010). Indeed, several other circuits have applied *First Options* in the labor context. *See, e.g.*, *ConocoPhillips*, *Inc*., 741 F.3d at 630–32; *Rock-Tenn Co. v. United Paperworkers Int'l Union*, 184 F.3d 330, 335–36 (4th Cir. 1999); *Local 744, Int'l Bhd. of Teamsters v. Hinckley & Schmitt, Inc*., 76 F.3d 162, 165 (7th Cir. 1996).

At all events, the unusual posture of this case distinguishes it from *George Day*. *George Day* embodies the classic scenario in which a party disputing arbitrability seeks to vacate an award it claims was decided without jurisdiction. The *George Day* employer sought to vacate an adverse arbitration award after fully litigating and

submitting the entire matter to the arbitrator. *See George Day*, 722 F.2d at 1474–75. Here, by contrast, the Union did not present any argument on substantive arbitrability to the arbitrator because it recognized that Mirage's second "arbitrability" argument was actually directed to the merits, and it believed that the issue would be argued and submitted at a later time. So unlike the employer in *George Day*, the Union is not seeking a second bite at the apple on an issue it previously briefed and submitted to the arbitrator.

The upshot of the foregoing is that although the arbitrator did not have authority to decide the question of substantive arbitrability, he concluded that the Union's grievance was "not arbitrable." As a result, the aggrieved employees were denied benefits to which the Union might have proven their entitlement had it presented its merits arguments to the arbitrator. That harm is undoubtedly significant in the eyes of the employees concerned. Equally important, however, is that left undisturbed, the arbitrator's award and the district court's confirmation of it establish a hazardous precedent whose consequences are likely to reverberate far beyond the benefits claims at issue in this case. On its terms, the arbitrator's award effectively carves out of the parties' arbitration agreement a wide swath of presumptively arbitrable grievances involving Mirage's (and potentially other employers') subcontractors.[3] And it does so without any textual basis in the CBA or rational basis in the law.

By blurring the line between arbitrability and merits determinations, the arbitrator's analysis contravenes foundational principles of the arbitral process by overlooking the limits the Supreme Court has placed on the

---

[3] The record indicates that the Union had substantially similar collective bargaining agreements with other hotels in the area.

arbitrator's presumptive powers. We conclude that the award cannot be squared with the holdings of *AT & T Technologies*, *First Options*, and *Granite Rock*.

## III.

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** with instructions to vacate the arbitration award.

---

OWENS, Circuit Judge, concurring:

I join the majority opinion because I believe it is more consistent with current controlling law.  That being said, I think the dissent reaches the more equitable result and, if the slate were blank, I would join it.  Perhaps most importantly, the extremely convoluted procedural posture of this case is so odd that our holding today likely will be limited to these very idiosyncratic facts.

---

FRIEDLAND, Circuit Judge, dissenting:

The majority assumes that the "clear and unmistakable" test for determining whether a party resisting arbitration has nevertheless consented to having the arbitrator decide substantive arbitrability also applies when determining whether a party that initiates arbitration has so consented.  I believe that test was never intended to extend to the latter context, and that applying it in such circumstances would lead to counterintuitive results and would be in tension with our caselaw.

## I.

The Supreme Court provided a helpful explanation of the "clear and unmistakable" test in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995). In that case, a stock-trading firm initiated arbitration against a "wholly owned investment company" and that company's individual owner and his wife. *Id.* at 940. The investment company—but not the individuals—had signed a contract with an arbitration provision, and the individuals accordingly argued before the arbitration panel that their dispute with the trading firm was not arbitrable. *Id.* at 941. The arbitration panel rejected that argument, concluding that it had the power to decide the whole case, and then ruled on the merits in favor of the trading firm. *Id.* The Supreme Court disagreed and held that the claims against the individuals were not arbitrable. *Id.* at 943.

The Court explained that when "parties d[o] *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question . . . independently," without any deference to the arbitrator's views on the question. *Id.* The Court further specified that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944 (alterations in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Based on these principles, the Court concluded that the trading firm could not show that the individuals "clearly agreed to have the arbitrators decide . . . the question of arbitrability." *Id.* at 946. Although the individuals had participated in the arbitration, they had objected to being in arbitration at all, so their participation in debate before the arbitrators about whether the dispute was

arbitrable did not clearly reflect consent to having the arbitrators decide arbitrability. *Id.*

In *First Options*, applying the stringent "clear and unmistakable" standard for demonstrating consent to allow the arbitrators to decide arbitrability made sense because, as the Supreme Court explained, the question of "who—court or arbitrator—has the primary authority to decide whether a party has agreed to arbitrate can make a critical difference to a *party resisting arbitration*," *id.* at 942 (emphasis added). "[A] party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute," but a party who "has agreed to arbitrate . . . has relinquished much of that right's practical value," because a reviewing court can "set that decision aside only in very unusual circumstances." *Id.* And "one can understand why courts might hesitate to interpret silence or ambiguity" by a party resisting arbitration "as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *Id.* at 945.

We have never applied the "clear and unmistakable" test to the very different procedural posture at issue in the present case, nor should we. Here, the party contending that the arbitrator did not have the authority to decide the scope of his own jurisdiction—*i.e.*, the question of substantive arbitrability—submitted its dispute with Mirage to the arbitrator. Yet, despite having submitted the dispute to the arbitrator, the Union would have us: (1) decide that the arbitrator did not have the authority to decide the question of his own jurisdiction over the dispute; but (2) conclude that the arbitrator did have jurisdiction over the merits of the dispute and thus send the case back to arbitration. This request is quite counterintuitive—indeed, it seems

fundamentally inconsistent for a party to say without reservation that it trusts the arbitrator's ability to decide the merits of the parties' dispute but that it does not trust the arbitrator to decide the arbitrator's own jurisdiction, especially when both issues turn on interpretation of the parties' contractual relationship and behavior.

We have previously refrained from applying the clear and unmistakable rule when doing so would have allowed a party to take inconsistent positions. In *PowerAgent Inc. v. Electronic Data Systems Corp.*, 358 F.3d 1187 (9th Cir. 2004), a plaintiff sued in federal court, but the district court held that the case needed to be resolved in arbitration. *Id.* at 1189. The plaintiff then submitted an amended complaint that omitted the parts of the complaint that the court had held triggered arbitration. *Id.* The court rejected that effort and sent the case to arbitration. *Id.* In arbitration, the plaintiff argued that the arbitration panel—and not the district court—should decide the question of substantive arbitrability with respect to all the claims. *Id.* at 1189–90. The arbitration panel concluded "that all the claims in the dispute, including the claims added in the Amended Complaint, were subject to the arbitration clause," and, after "extensive proceedings," ruled on the merits in favor of the defendants. *Id.* at 1190.

The plaintiff then sought "to vacate the arbitration award," arguing that the arbitration panel did not have the authority to decide whether the dispute was substantively arbitrable. *Id.* at 1190–91. We refused to vacate the award. *Id.* at 1191. We recognized that normally "arbitrability is . . . for courts" to decide "unless there is clea[r] and unmistakabl[e] evidence that" "the parties agreed to arbitrate arbitrability." *Id.* (alterations in original) (internal citations omitted). But we concluded that "neither paradigm quite

fit[]" the situation at issue because "[w]hether or not the parties agreed with one another to arbitrate the arbitrability issue, [the plaintiff] affirmatively submitted the issue to the arbitrators and urged that they had the power to decide it." *Id.* In other words, "*First Options* d[id] not resolve the question" in *PowerAgent* because in *First Options* "the *defendants* in arbitration filed with the arbitrators a memorandum opposing the arbitrators' jurisdiction," and in *PowerAgent* the *plaintiff* was opposing the arbitration panel's ability to decide substantive arbitrability after submitting that question to it. *Id.* at 1191–92.

Similarly, in *Nghiem v. NEC Electronic, Inc.*, 25 F.3d 1437 (9th Cir. 1994), *cert denied* 513 U.S 1044 (1994),[1] we considered a situation in which a party had "initiated the arbitration, attended the hearings with representation," and participated fully in those hearings, but then asked a court to decide that the dispute was not arbitrable partway through the arbitration proceedings. *Id.* at 1439–40. There, we held that "[o]nce a claimant submits to the authority of the arbitrator and pursues arbitration, he cannot suddenly change his mind and assert lack of authority." *Id.* at 1440.

Of course, unlike in *PowerAgent*, the Union here did not "affirmatively submit" the question of substantive arbitrability to the arbitrator, and unlike in *Nghiem*, the Union is not arguing that the merits of the dispute are not arbitrable. Rather, here, the Union is arguing that the dispute

---

[1] Although this case was decided before *First Options*, we have since cited it approvingly. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1279 (9th Cir. 2006) (en banc) (explaining that in cases like *Nghiem* "where we have found waiver [of the ability to challenge the arbitrator's ability to decide substantive arbitrability], the objecting party ha[d] participated far more extensively than [the present objecting party] did before resorting to the courts").

is arbitrable but that the court—and not the arbitrator—should decide that jurisdictional question and then should send the parties back to arbitration.  Still, like the plaintiffs in both *PowerAgent* and *Nghiem*, the Union here submitted the dispute to the arbitrator without reservation.  It would therefore be at least in tension, if not direct conflict, with *PowerAgent* and *Nghiem* to allow the Union here to have its cake and eat it too.

## II.

Because the Union submitted the dispute to arbitration in the first place, I would apply traditional standards of waiver to the Union's actions instead of applying the clear and unmistakable rule.  *Cf. In re Duncan*, 713 F.2d 538, 542–43 (9th Cir. 1983) ("Venue is a privilege that is waived if not timely asserted."); *Nghiem*, 25 F.3d at 1440 (observing that a party's "voluntary initiation of arbitration can be interpreted as waiver of any objection he may have had over the authority of the arbitrator").[2]

Under those standards, the Union waived its objection to the arbitrator's deciding the substantive arbitrability question.  When Mirage argued during the arbitration that the dispute was not substantively arbitrable, the Union did not contend that Mirage needed to make any such argument to a court rather than to the arbitrator.  Nor did the Union

---

[2] Initiating arbitration should not, in and of itself, always mean that a party has waived or forfeited any objection to the arbitrator's deciding the question of substantive arbitrability, but it may be evidence of such. For example, the situation here might be different if the Union had objected immediately that a court should decide the question of substantive arbitrability when Mirage first argued that the dispute was not arbitrable.

seek a stay of the arbitration to bring the issue to a court itself.  Instead, the Union indicated a willingness to argue the substantive arbitrability question before the arbitrator when it stated that it would "vigorously oppose . . . any last-minute argument for the first time raised at the hearing that [the dispute is] not arbitrable."[3]

Because the Union waived the objection it now makes to the arbitrator's deciding arbitrability, we should review his answer to that question using the same "standard courts apply when they review any other matter that parties have

---

[3] Even if it could be said that the Union forfeited (rather than waived) its objection and that we therefore should review that objection now for plain error, the Union could not show that the arbitrator committed plain error in concluding that he had the authority to decide his own jurisdiction.  To demonstrate plain error in the civil context, a party must show (1) an error, (2) that was obvious, and (3) that was prejudicial or affected substantial rights, and (4) that "review is necessary to prevent a miscarriage of justice."  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002).

There was no obvious error here.  The same conduct that I believe effected a waiver would, even if not deemed a waiver, have signaled to the arbitrator that he had the authority to decide the substantive arbitrability question.

There was also no "miscarriage of justice."  *Id.*  The Union cries foul because it had no chance to *brief* the merits questions to the arbitrator before the arbitrator effectively decided the merits in the course of throwing out the case as non-arbitrable.  But the Union ignores the fact that it did have an opportunity to argue the merits during the arbitration proceeding.  Indeed, after Mirage raised its substantive arbitrability objection, and after the Union argued that Mirage's objection went to merits of the dispute, the parties argued the merits before the arbitrator. Intervening now would give the Union two bites at the apple as to the merits question, which "[p]arties normally do not get."  *John v. United States*, 247 F.3d 1032, 1051 (9th Cir. 2001) (en banc) (Rymer, J., concurring in part, dissenting in part, and dissenting from the judgment).

agreed to arbitrate," *First Options*, 514 U.S. at 943. "That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *Id.* "If an 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *S. Cal. Gas Co. v. Util. Workers Union, Local 132*, 265 F.3d 787, 792 (9th Cir. 2001) (quoting *E. Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 U.S. 57, 62 (2000)); *see also Sw. Reg'l Council of Carpenters v. Drywall Dynamics, Inc.*, 823 F.3d 524, 530 (9th Cir. 2016) (noting that we may set aside that decision only if it "fails to 'draw[] its essence from the collective bargaining agreement,' such that the arbitrator is merely 'dispens[ing] his own brand of industrial justice'" (alterations in original) (quoting *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960))).

Here, even if the arbitrator erred by deciding the merits of the dispute when purporting to decide whether the dispute was substantively arbitrable, he grounded his decision in the CBA. His decision therefore was not merely "his own brand of industrial justice." *Sw. Reg'l Council of Carpenters*, 823 F.3d at 530 (quoting *United Steelworkers*, 363 U.S. at 597). I would therefore affirm the district court's decision not to vacate the arbitrator's ruling.

For the foregoing reasons, I respectfully dissent.